# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Phillips and Jordan, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER ON MOTIONS FOR PARTIAL** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| AM Dirtworks and Construction LLC, | ) | Case No. 1:17-cv-00006 |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case arises from disputes surrounding aggregate crushing performed in two separate gravel pits – one north of Williston, North Dakota ("Frank Pit"), and the other near Fairview, Montana ("Fairview Pit"). Plaintiff Phillips and Jordan, Inc. ("Phillips") contends that Defendant AM Dirtworks and Construction LLC ("Dirtworks") produced aggregate from the Frank Pit that failed to conform to the technical specifications required to complete a road construction project on Highway 85 in western North Dakota ("Project"). Dirtworks counters that Phillips wrongly refused to pay for rejected material produced from the Frank Pit and other outstanding invoices. Complicating the matter, the parties proffer dueling written contracts, as well as corollary oral agreements, that purport to control their obligations. Unrelated to those disagreements but around the same time, Dirtworks subleased aggregate crushing in the Fairview Pit to Phillips. Dirtworks claims Phillips subsequently excavated outside the authorized work area, resulting in the State of Montana shuttering the Fairview Pit contingent on costly reclamation efforts. From these events, Phillips and Dirtworks each assert various causes of action predicated on express contract, quasi-

contract, and negligence theories.  Now before the Court are Phillips and Dirtworks' respective motions for partial summary judgment that seek to dismiss most of the claims.[1]  Doc. Nos. 55, 60.

## I.  <u>BACKGROUND</u>

Phillips is a North Carolina corporation headquartered in Tennessee that specializes in heavy civil construction.  Doc. No. 57, ¶ 3.  Dirtworks is a Utah limited liability company that provides aggregate crushing services to contractors.  Doc. No. 64, ¶ 2.  A synopsis of this case's factual background and procedural history follows.

### A.  **Frank Pit**

In May 2015, the North Dakota Department of Transportation ("NDDOT") engaged Knife River Corporation ("Knife River") to serve as general contractor for the Project.  Doc. No. 57, ¶ 4.  Knife River then subcontracted aggregate work to Phillips on July 21, 2015.  <u>Id.</u> ¶ 5.  Phillips agreed to supply two types of aggregate relevant to this lawsuit: "Plant Mix FAA 45," essentially a blend of several aggregates used for asphalt paving, and "DOT Class 5," a particular base gravel.  Doc. No. 62-3, p. 77.  The NDDOT publishes comprehensive specifications that contractors must adhere to before aggregate can be utilized in road projects.  <u>See</u> Doc. No. 64-6.  The component parts of FAA 45 vary depending on the qualities of each gravel pit and other factors, and the NDDOT must approve an individualized mix design from a pit before incorporation into a project.  Doc. No. 62-3 at 17:23-18:11.  Class 5 is a single aggregate with certain gradation requirements.  <u>See</u> <u>id.</u> at 16:14-22.  That means the gravel is run through multiple sieve sizes, and if too much or

---

[1] Also pending is Dirtworks' motion to strike Phillips' reply brief and supporting affidavits.  Doc. No. 98.  Phillips' reply brief merely rebuts arguments raised in Dirtworks' response.  Further, a motion to strike an affidavit is not cognizable under the Federal Rules of Civil Procedure.  <u>See</u> <u>Ecolab Inc. v. Kuntz</u>, Case No. 2:15-cv-3, 2015 WL 12803641, at *3 (D.N.D. Nov. 12, 2015).  The motion (Doc. No. 98) is **DENIED**.

too little material passes through any given sieve, then the aggregate fails the Class 5 requirements. See Doc. No. 64-6, p. 41.

Dirtworks' involvement with the Project began shortly after Knife River subcontracted aggregate work to Phillips. After exploring opportunities to expand into North Dakota, Dirtworks began a lease to excavate the Frank Pit in early 2015. Doc. No. 51, ¶ 21. Matt Mitchell, Dirtworks' owner, had represented to Phillips that he possessed 25 years of experience in the construction industry and knowledge of the NDDOT aggregate specifications. See Doc. Nos. 64, ¶¶ 2, 8; 72, ¶ 4. Intending to use Dirtworks' services and the Frank Pit to supply aggregate for the Project, Phillips entered into a "continuing short form contract" with Dirtworks on July 28, 2015 ("July Agreement"). Doc. No. 57-1.

Mitchell and Phillips Vice President John West signed the July Agreement, which contains several noteworthy provisions. Id. at 4. The stated intent was "to provide a mechanism of affording a simple and effective means of awarding multiple project tasks to [Dirtworks] without the need for individual contracts." Id. at 1. The July Agreement's terms were to take effect upon a delegation of work from Phillips to Dirtworks. Id. While the agreement contemplated future work orders that would define the scope of work, scheduled completion time, and compensation for specific assigned tasks, Phillips never prepared any work orders for the Project. See Doc. No. 72, ¶ 8. The absence of a work order, however, did not prevent the July Agreement from activating when a delegation of work occurred. Doc. No. 57-1, p. 1. As for performance, Dirtworks consented "to furnish all necessary labor, equipment, materials, supplies and other items required and . . . to complete the work . . . to the satisfaction of and in compliance with the directions of [Phillips] or [Phillips'] Engineers." Id. The July Agreement required Dirtworks to submit monthly invoices, with Phillips obliged to remit payment within 30 days of receipt. Id. Phillips initially

3

contracted with another company to produce aggregate for the Project, paying royalties to Dirtworks for the Frank Pit's use. Doc. No. 51, ¶ 27. In the meantime, Dirtworks commenced crushing work for Phillips on other projects and submitted its first invoice on July 30, 2015. Doc. No. 88, ¶ 2.

At the beginning of September 2015, Phillips shifted course and requested that Dirtworks take over aggregate crushing in the Frank Pit. Doc. No. 51, ¶ 28. Dirtworks avers that the parties then entered into a second "standard terms and conditions" contract on September 1, 2015 ("September Agreement") that superseded the July Agreement. Doc. No. 64, ¶ 5. Like before, Mitchell signed on Dirtworks' behalf. Doc. No. 64-2, p. 6. Unlike before, Jerady Sticka—an aggregate manager and the son of a Dirtworks employee—signed for Phillips. Id. Sticka does not remember signing the September Agreement or the surrounding circumstances. Doc. No. 80, ¶ 3. He recognized his signature on the document, though, and knew the contract related to aggregate crushing in the Frank Pit. Id. Sticka asserts that he regularly entered into contracts with subcontractors and that the September Agreement was the type of contract he normally signed on Phillips' behalf. Id. ¶ 4. Several of Sticka's superiors involved with the Project challenge that, contending Sticka did not have authority to sign contracts for Phillips and that no one authorized him to sign the September Agreement. Doc. Nos. 72, ¶ 11; 93, ¶ 8; 94 ¶¶ 5-7. Those employees additionally state that they were unaware of the September Agreement's existence and that Phillips would not have entered into such a contract in light of the preexisting July Agreement. See id.

The September Agreement's apparent purpose was to accept a "Job Quotation . . . provided by [Dirtworks]," but no accompanying written quotation exists. Doc. No. 64-2, p. 1. Mitchell acknowledges that he did not submit a quote for the entire Project at that time because the NDDOT had yet to approve a mix design for the FAA 45. Doc. No. 64, ¶ 7. Instead, Mitchell alleges he

provided a contemporaneous oral quote on a "time and materials" basis that called for Phillips to pay Dirtworks $3 per ton for Class 5 aggregate and $7 per ton for FAA 45. Doc. No. 90, ¶ 3. Dirtworks later submitted a written quote to Phillips on January 12, 2016 that reflected the same prices and included the minimum aggregate quantities needed to complete the Project. Doc. No. 64-3. But no one from Phillips signed or otherwise accepted the quote. Doc. No. 64, ¶ 15. The parties therefore failed to reach a written agreement on aggregate prices and quantities. Id. ¶ 16. With that said, the parties concur that the prices included in the January 12, 2016 quote accurately represent what Phillips actually paid Dirtworks, as numerous fulfilled invoices make clear. See Doc. No. 72, ¶ 10.

The September Agreement's terms differ from the July Agreement in important respects. For example, the September Agreement contained a more limited commitment to provide conforming aggregate only "at the time [Dirtworks] furnishes the Materials to [Phillips]." Doc. No. 64-2, p. 1. A limitation of liability clause excluded recovery for certain types of damages, including consequential damages. Id. at 2. Also of significance, the September Agreement stated that Phillips would assume responsibility for quality control and that Dirtworks would not "be responsible or liable for any pay . . . reductions, whether assessed by the project owner or otherwise, as a result of quality control results." Id. at 3. A no oral modification clause added a requirement that any alterations to the September Agreement be memorialized in a signed writing. Id. at 4. And a merger clause conferred the apperance of a final agreement between the parties, superseding any prior or contemporaneous written or oral agreements by its terms. Id. at 5.

Not long after inking the September Agreement, Dirtworks commenced crushing work in the Frank Pit. At first, Dirtworks produced approximately 65 tons of usable aggregate for every 100 tons of excavated material, and the work progressed relatively issue-free. Doc. No. 64, ¶ 12.

But by early 2016, the Frank Pit had, in Mitchell's words, "gone bad" because there was too much sand in the pit, as opposed to the hard rock needed to produce quality aggregate. Id. At that point, 100 tons of excavated material yielded a mere 5-10 tons of acceptable aggregate, necessitating additional work to produce the required quantities the Project demanded. Id.

In response to the troubles in the Frank Pit, Dirtworks claims that three Phillips employees—Kyger Hill, Tom Stull, and Clint Stephens—entered into an oral agreement with Mitchell in February 2016 ("February Agreement") during a meeting at Phillips' office in Williston, North Dakota. Id. ¶ 16. As alleged, the February Agreement required Phillips to pay Dirtworks for reject material produced from the Frank Pit at a rate of $1 per ton in exchange for Dirtworks providing crushing services through the Project's conclusion. Id. Dirtworks also asserts that the Phillips representatives consented to Dirtworks billing for reject in lump sums at the end of the Project, rather than submitting monthly invoices, for administrative convenience purposes. Doc. No. 79, ¶¶ 15-16. Hill attests that Phillips promised to pay Dirtworks $1 per ton for reject material in early 2016, although he does not specifically recount a February 2016 meeting in Williston. Doc. No. 63, ¶ 8. Stull and Stephens, on the other hand, deny authorizing Dirtworks to bill for reject at any time and assert that no meeting occurred resulting in such an agreement. Doc. Nos. 93, ¶¶ 4-5; 94, ¶ 4. They likewise deny that Phillips would have permitted Dirtworks to submit lump-sum invoices at the end of the Project and note that allowing a subcontractor to bill for reject material cuts against industry norms. See Doc. No. 93, ¶ 6.

Dirtworks separately claims Phillips promised additional crushing work in western North Dakota if Dirtworks stayed on through the end of the Project as part of the February Agreement. Doc. No. 64, ¶ 16. Mitchell recalls that Stephens, in April 2016, referenced 25 gravel pits Phillips had leased in western North Dakota that needed 500,000 tons of Class 5 aggregate crushed. Doc.

No. 79, ¶ 41. Mitchell estimates this work would have earned him $700,000 in profit. Id. ¶ 43. Phillips retorts that the company was no longer seeking projects in North Dakota and did not have future projects for Dirtworks to provide crushing services on after the Project. Doc. No. 57, ¶ 16.

Throughout the Project, Phillips employed a quality control manager, Holly Bender, who conducted two or three daily gradation tests on aggregate produced from Dirtworks' crusher. Doc. No. 64, ¶ 19. She performed roughly 500 gradation tests in total. Doc. No. 63, ¶ 10. The aggregate failed the tests on three or four occasions. Id. Gradation tests are not entirely effective for testing FAA 45, however. Doc. No. 72, ¶ 18. Not only do the individual aggregate components have to meet gradation requirements, but the mix of those aggregates must satisfy the NDDOT specifications, too. Id.

The NDDOT did not approve a mix design for the FAA 45 produced from the Frank Pit until March 2016, six months after Dirtworks began crushing. Doc. No. 62-3, p. 91. Prior to that, Sticka and Mitchell estimated based on their experience how much aggregate the Project would require, and Dirtworks had already begun crushing in preparation for approval of the mix design. Doc. No. 64, ¶ 14. Once approved, though, the NDDOT rejected FAA 45 produced from the Frank Pit due to failures to meet the mix design's specifications. Doc. No. 62-3 at 93:2-12. Toward the end of the Project, Rob Rebel, vice president of aggregate for Knife River, emailed Stephens and stated that the FAA 45 mix was losing too much necessary 5/8" rock because of certain screens Dirtworks used in the crushing process. Doc. No. 71-3. Knife River recommended using different screens to correct the problem, but Dirtworks refused. Id. In another email chain, Rebel expressed surprise that Mitchell believed the rock was oversized, when his understanding was that all the parties involved thought there was too much sand in the rock. Doc. No. 71-2. The NDDOT later rejected some of the FAA 45 produced from the Frank Pit because of excess sand. Id.

The NDDOT similarly rejected Class 5 aggregate produced from the Frank Pit based on quality issues. Id. Dirtworks claims that the deficiencies resulted from factors that coalesced after Knife River applied the Class 5 to the road. Doc. No. 63, ¶ 12. In other words, Dirtworks' position is that the aggregate conformed to the NDDOT specifications when provided to Phillips, and that any nonconformities developed afterwards. Id. Phillips, meanwhile, contends Dirtworks had issues crushing acceptable Class 5 aggregate and failed to properly diagnose and correct those issues. The NDDOT rejected a large portion of the Class 5 aggregate produced from the Frank Pit in May and June 2016. Doc. No. 72, ¶ 16.

Eventually, the NDDOT refused to accept Class 5 from the Frank Pit altogether. See Doc. No. 72-2. Dirtworks and Phillips also fell short of producing enough FAA 45 to meet the Project's requirements. See Doc. No. 72-3. In response, Knife River sought alternative sources of aggregate to complete the Project, offsetting the extra costs from the amount owed to Phillips on the primary subcontract. Doc. No. 72, ¶ 19. Dirtworks concluded work on the Project following the NDDOT's decision to stop accepting aggregate from the Frank Pit. Doc. No. 64, ¶ 18.

After the Project wrapped up, Dirtworks submitted two invoices for reject material, one for $400,000 on July 14, 2016 and another for $651,160 on August 12, 2016. Doc. No. 64-5, pp. 74, 76. Phillips refused to pay both invoices. See Doc. No. 57-4. Beyond the claims for reject, Phillips acknowledges several other invoices remain unpaid. Id. As is customary in the construction industry, Phillips withheld two percent of every paid invoice to allow for final reconciliation with Dirtworks at the Project's conclusion. Id. That retained amount remains unpaid as well. Id. All told, Dirtworks engaged in aggregate crushing for the Project from September 2015 until July 2016, submitting approximately 40 invoices on a near-weekly basis. Doc. No. 64, ¶ 18. Phillips paid Dirtworks for invoices of both FAA 45 and Class 5 aggregate that the NDDOT ultimately

rejected. Doc. No. 72, ¶ 19. Normally, when Phillips paid an invoice, Mitchell signed lien waiver and release forms that discharged Phillips from further payment obligations for the labor and materials invoiced through the date specified on each form. See Doc. No. 57-3.

## B. Fairview Pit

Dirtworks entered into a lease with RKT, LLC ("RKT") on April 15, 2014 to mine gravel from the Fairview Pit. Doc. No. 81-1. Montana requires contractors to obtain both a permit and a bond before commencing excavation. Doc. No. 81, ¶ 4. The permit Dirtworks acquired allotted 54.1 acres for mining, while the bond covered 29.6 acres. Id. ¶ 5. So in practical effect, Dirtworks was limited to excavating the bonded area. See id. Dirtworks crushed gravel in the Fairview pit from April 2014 until August 2015 without incident. Id. ¶ 8.

When Dirtworks prepared to head for the Frank Pit in August 2015, Dirtworks and Phillips entered into an oral agreement that allowed Phillips to utilize the Fairview Pit. Doc. No. 92, ¶ 2. Phillips agreed to pay Dirtworks a royalty of $2.50 per ton of aggregate produced. See Doc. Nos. 92-1, 92-2. Dirtworks remained on the lease, and RKT apparently assented to Phillips' sublease. Doc. No. 81, ¶¶ 11, 20. Under the original lease, Dirtworks was responsible for ensuring that excavation took place within the bonded area. Doc. No. 81-1. To comply with that requirement, Dirtworks marked the bonded area's outer boundary with metal posts and wooden stakes with orange ribbon. Doc. No. 79, ¶ 29. Mitchell and Sticka walked the Fairview Pit before Phillips took over excavation and Mitchell pointed out the western boundary. Id. Mitchell then departed for the Frank Pit and did not return during the time Phillips worked in the Fairview Pit. Id. ¶ 31.

Phillips crushed aggregate in the Fairview Pit for approximately three months, from August to October 2015. Doc. No. 92, ¶ 3. Gordon Torgerson, RKT's managing member, observed that Phillips began excavating outside the bonded area's western boundary soon after taking over

mining operations. Doc. No. 81, ¶ 13. On February 9, 2016, the Montana Department of Environmental Quality submitted a report that found several compliance violations following a site inspection. See Doc. No. 82-1. Chief among them, more than 11.3 acres had been excavated outside the bonded area. Id. at 2. The State of Montana then shut down mining operations in the Fairview Pit until the improperly excavated area underwent reclamation work. Doc. No. 81, ¶ 19. With the Fairview Pit out of commission, RKT held Dirtworks responsible. Id. ¶ 20. To settle up with RKT, Dirtworks traded a backhoe to Hill in July 2016 (who was no longer working for Phillips by that time) in exchange for Hill performing $20,000 in reclamation work. Doc. No. 79, ¶¶ 35-36. Mitchell additionally states that he left aggregate in the Fairview Pit as partial repayment to RKT. Id. ¶ 37. Dirtworks had also intended to resume mining the Fairview Pit, which held roughly one million tons of unexcavated soil, after work on the Project ended. Id. ¶ 38.

## C.    Procedural History

Phillips instituted this action on January 6, 2017. Doc. No. 1. When Dirtworks failed to timely answer or otherwise respond, default was entered on April 14, 2017. Doc. No. 13. Phillips moved for a default judgment, but Dirtworks responded with an answer and counterclaim on May 1, 2017, simultaneously moving to set aside the entry of default. Doc. Nos. 21, 22. The Court granted that motion and set aside default on October 30, 2017. Doc. No. 40. With leave from the Court, Dirtworks filed an amended counterclaim on October 31, 2018. Doc. No. 51. Phillips answered the amended counterclaim on November 21, 2018. Doc. No. 52. Phillips moved for partial summary judgment on February 5, 2019, Dirtworks did the same the next day, and both submitted timely response and reply briefs thereafter. Doc. Nos. 55, 60.

## II.  **LEGAL STANDARD**

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In this diversity action, the parties agree North Dakota law controls. Accordingly, the Court will apply North Dakota Supreme Court precedent and attempt to predict how that court would decide any state-law questions it has yet to resolve. See Stuart C. Irby Co., Inc. v. Tipton, 796 F.3d 918, 922 (8th Cir. 2015).

## III. FRANK PIT CLAIMS

From the events in the Frank Pit, Phillips asserts claims for breach of contract (Count I), unjust enrichment (Count II), declaratory judgment (Count III),[2] negligence (Count IV), and breach of warranty (Count V). See Doc. No. 1. Dirtworks moves for summary judgment on Counts I, II, IV, and V of Phillips' complaint. Dirtworks' Frank Pit counterclaim, meanwhile, includes causes of action for breach of contract (Count I), unjust enrichment (Count II),[3] quantum meruit (Count III), and "loss of past and future profits" (Count VI). See Doc. No. 51. Phillips seeks summary judgment on Counts II, III, and VI in their entirety and on Count I in part.

### A. Phillips' Frank Pit Claims

The Court first addresses Dirtworks' motion for partial summary judgment. Phillips' complaint avers that Dirtworks failed to provide aggregate for the Project that conformed to NDDOT specifications, resulting in Knife River obtaining aggregate from other sources and Phillips suffering a concomitant loss of revenue. To vindicate these claims, Phillips relies on express contract, unjust enrichment, negligence, and breach of warranty theories.

#### 1. Breach of Contract

Dirtworks advances three grounds for dismissal of Phillips' breach of contract claim. Namely, Dirtworks asserts that Phillips has failed to present evidence showing Dirtworks supplied nonconforming aggregate, that the responsibility for quality control rested exclusively with

---

[2] Neither party moved for resolution of the declaratory judgment claim. Going forward, the Court will construe the claim under the Federal Declaratory Judgment Act, not the North Dakota Declaratory Judgment Act. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 416 (1996) (explaining that "federal courts sitting in diversity apply state substantive law and federal procedural law"); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (citation omitted) ("The operation of the [Federal] Declaratory Judgment Act is procedural only.").

[3] Dirtworks does not oppose summary judgment on its unjust enrichment claim, so the Court will grant Phillips' motion as to Count II.

Phillips, and that the September Agreement's limitation of liability clause precludes Phillips from recovering damages. A host of fact disputes precludes summary judgment on this claim.

"A breach of contract is the nonperformance of a contractual duty when it is due. The elements of a prima facie case for breach of contract are: (1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." WFND, LLC v. Fargo Marc, LLC, 2007 ND 67, ¶ 13, 730 N.W.2d 841 (citations omitted). At the outset, the parties plainly disagree over which contract controls their mutual obligations for the Project. Even under the more limited September Agreement, however, Dirtworks consented to provide aggregate that conformed "at the time [Dirtworks] furnishes the [aggregate] to [Phillips], to the applicable specifications for the [Project]." Doc. No. 64-2, p. 1.

Regardless of which contract controls, viewing the facts in the light most favorable to Phillips compels the conclusion that the trier of fact must resolve whether Dirtworks failed to supply conforming aggregate. Dirtworks is correct in noting that simply regurgitating conclusory assertions that the company had issues producing conforming aggregate is insufficient to sustain a breach of contract claim. Yet the record reveals several specific alleged shortcomings in Dirtworks' aggregate production that prevent the Court from determining that there is no evidence to support the claim as a matter of law. For one, Dirtworks admits that aggregate failed Phillips' gradation tests at least three or four times. And there is no dispute that the NDDOT refused to accept aggregate Dirtworks produced from the Frank Pit on numerous occasions—and eventually altogether. This included FAA 45 mix, for which gradation tests alone are not completely effective for determining compliance with NDDOT specifications. More specifically, there is evidence that Dirtworks failed to select the correct screens to yield the appropriate amount of 5/8" rock for the FAA 45, and then Dirtworks refused to correct course when Knife River suggested using different

screens to address the problem. Rebel further expressed surprise that Dirtworks believed the problem with the aggregate was oversize rock, while others thought the problem was too much sand. Because of excess sand, the NDDOT later rejected FAA 45 from the Frank Pit. The NDDOT likewise rejected the Class 5 aggregate almost entirely for the months of May and June 2016 based on quality issues. These facts give rise to a reasonable inference that Dirtworks failed to supply Phillips with conforming aggregate as promised in both the July and September Agreements. Summary judgment is therefore inappropriate.

Notwithstanding that, Dirtworks contends summary judgment is warranted even if there is a dispute regarding the aggregate's conformity. Dirtworks supports this contention by pointing out that Phillips, in the September Agreement, both assumed responsibility for quality control and forfeited the ability to recover consequential damages. These arguments unavoidably raise the question of which contract controls.

If the July Agreement controls, then the sole issue for resolution is the conformity of Dirtworks' aggregate to the NDDOT specifications. But if the September Agreement superseded the July Agreement, then additional analysis is necessary to determine the effect of the quality control and liability limitation provisions. Obstructing that inquiry, Phillips assails the September Agreement as invalid for two reasons. Phillips argues that Sticka did not have authority to enter into the September Agreement, and even if he did, the September Agreement is too vague and indefinite to be enforceable.

Sticka's authority to enter into the September Agreement on Phillips' behalf presents a triable fact dispute. "An agency relationship is either actual or ostensible. It is actual when the agent really is employed by the principal." Farmers Union Oil Co. of Dickinson v. Wood, 301 N.W.2d 129, 133 (N.D. 1980). When an agency relationship is established, "[t]he scope of an

14

agent's authority is a question of fact." First Nat'l Bank & Tr. Co. of Williston v. Scherr, 467 N.W.2d 427, 430 (N.D. 1991) (citing Red River Commodities, Inc. v. Eidsness, 459 N.W.2d 805, 810 (N.D. 1990)).  Just as an agency relationship itself may be actual or ostensible, an agent's authority to bind the principal may be actual or ostensible. See Wood, 301 N.W.2d at 133. "Actual authority is authority which the principal intentionally confers upon the agent or by want of ordinary care allows the agent to believe himself to possess." Id. "Ostensible . . . authority is authority which the principal intentionally or by want or ordinary care allows a third person to believe the agent possesses." Id. (internal quotation marks omitted) (citing N.D. Cent. Code § 3-02-02).  A proponent of an ostensible authority theory "must bear the burden of determining for himself, by the exercise of reasonable diligence and prudence, the existence or nonexistence of the agent's authority to act." Transamerica Ins. Co. v. Standard Oil Co. (Indiana), 325 N.W.2d 210, 214 (N.D. 1982) (quoting Hagel v. Buckingham Wood Prods., 261 N.W.2d 869, 875 (N.D. 1977)).

Applying these principles, Sticka was employed as an aggregate manager, meaning he was Phillips' actual agent.  The rub lies in whether Sticka exceeded his authority by signing the September Agreement.  If so, the contract is not binding on Phillips.  Dirtworks asserts that Sticka had actual authority because he regularly signed contracts like the September Agreement for Phillips and believed he had authority to do so on that occasion.  Multiple Phillips employees that occupied management roles on the Project counter by stating Sticka did not have any authority to enter into contracts on Phillips' behalf.  For ostensible authority, Mitchell points out that Sticka was one of his main contacts for the Project, and as an aggregate manager, he also approved Dirtworks' invoices for payment.  This purportedly led Mitchell to believe Sticka had authority to sign the September Agreement.  The Phillips employees, on the other hand, contend no one informed Mitchell that Sticka could sign contracts for Phillips.  And Phillips argues Mitchell failed

to exercise reasonable diligence in ascertaining the scope of Sticka's authority when considering the July Agreement's stated intent of avoiding the need for future contracts and the fact that Phillips' vice president, not Sticka, signed the earlier contract. Viewed in the light most favorable to Phillips, a genuine dispute exists as to whether Sticka had either actual or ostensible authority to enter into the September Agreement.

The Court cannot conclude as a matter of law that the September Agreement is sufficiently definite at this juncture, either. To be enforceable, a contract "must be reasonably definite and certain in its terms so that a court may require it to be performed. The contract must be definite enough so as to ascertain what is required of the parties." In re Estate of Hill, 492 N.W.2d 288, 293 (N.D. 1992) (citing Mag Constr. Co. v. McLean Cty., 181 N.W.2d 718 (N.D. 1970)). "Contracts can be partly written and partly oral." Lord & Stevens, Inc. v. 3D Printing, Inc., 2008 ND 189, ¶ 12, 756 N.W.2d 789 (citation omitted). When the parties include a merger clause in a written contract, that ordinarily—but not conclusively—establishes complete integration, meaning the writing constitutes the full and final expression of the parties' agreement. See Herman Oil, Inc. v. Peterman, 518 N.W.2d 184, 190 n.5 (N.D. 1994). If a contract is completely integrated, extrinsic evidence is inadmissible to vary or supplement the terms of the writing. See Felco, Inc. v. Doug's N. Hill Bottle Shop, Inc., 1998 ND 111, ¶ 18, 579 N.W.2d 576. "However, parol or extrinsic evidence can be used to show . . . that the contract was only partially integrated because essential elements were not reduced to writing." In re Estate of Lutz, 1997 ND 82, ¶ 37, 563 N.W.2d 90 (citing Mau v. Schwan, 460 N.W.2d 131, 134 (N.D. 1990)). Where a written contract is partially integrated, extrinsic evidence is then properly admitted to establish terms consistent with the writing. See Felco, Inc., 1998 ND 111, ¶ 18, 579 N.W.2d 576. "The existence of an oral

contract and the extent of its terms are questions of fact." Lord & Stevens, Inc., 2008 ND 189, ¶ 12, 756 N.W.2d 789.

Here, Dirtworks admits there is no written "Job Quotation" for the September Agreement to accept. But Mitchell does assert that he provided a contemporaneous oral quote for the Project on a "time and materials basis" for Phillips to pay $3 per ton for Class 5 and $7 per ton for FAA 45. Phillips contests this, denying that the parties reached any oral agreement regarding prices at that time. The Court finds that despite the merger clause, the September Agreement is partially integrated based on the nonexistence of a written job quotation, Mitchell's claim of a "time and materials" quote, and also Phillips' acknowledgement that the quoted Class 5 and FAA 45 prices matched what Phillips paid Dirtworks throughout the parties' relationship. The trier of fact must resolve whether the parties actually reached an oral agreement regarding aggregate prices contemporaneous with the September Agreement, as well as the terms of that oral agreement. Until that occurs, the Court cannot determine that the September Agreement is sufficiently definite to create a binding contract.[4] Because the September Agreement's validity must be ascertained first, this opinion does not reach the effect of the quality control or liability limitation provisions.

Dirtworks lodges one more argument against Phillips' breach of contract claim, contending that the parties' course of performance illustrates Phillips assumed responsibility for quality control even if the July Agreement governs. "[T]he parties' conduct in the course of performance after the contract's formation can help determine the meaning of ambiguous language." Nat'l Bank of Harvey v. Int'l Harvester Co., 421 N.W.2d 799, 803 (N.D. 1988) (citations omitted). "An

---

[4] The July Agreement raises similar issues because Phillips never prepared any work orders for the Project. Extrinsic evidence of an oral delegation of work that defined the aggregate prices and scope of work for the Project is needed to determine the July Agreement's omitted terms and corresponding validity.

ambiguity resolved by use of extrinsic evidence is a question of fact for the trier of fact to decide."
Id. Dirtworks points out Phillips employed a full-time quality control manager that performed two or three daily gradation tests in the Frank Pit, and Phillips was the primary liaison with Knife River when quality issues arose. Assuming without deciding that the July Agreement is ambiguous on this issue, the parties' course of performance in delegating quality control is a disputed question of fact not amenable to summary judgment. Therefore, Phillips may proceed with its breach of contract claim, but the Court will permit Dirtworks to renew its motion upon resolution of the September Agreement's enforceability.

2. Unjust Enrichment

At this stage, summary judgment is equally unwarranted on Phillips' unjust enrichment claim. "To recover under a theory of unjust enrichment, the plaintiff must prove: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) the absence of a justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." KLE Constr., LLC v. Twalker Dev., LLC, 2016 ND 229, ¶ 6, 887 N.W.2d 536 (quoting McColl Farms, LLC v. Pflaum, 2013 ND 169, ¶ 18, 837 N.W.2d 359). Phillips seeks unjust enrichment damages for paying Dirtworks for invoices that included aggregate the NDDOT rejected.

Like the breach of contract claim, there is sufficient evidence in the record to create a triable issue as to whether Dirtworks was unjustly enriched by receiving payment for nonconforming aggregate. Dirtworks may renew its motion on this claim following determination of the September Agreement's enforceability. The unjust enrichment claim is necessarily barred, however, to the extent Phillips is able to recover on the breach of contract claim. See Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc., 2004 ND 117, ¶ 28, 680 N.W.2d 634 (citation omitted) (stating

that "unjust enrichment applies only in the absence of a contract between the parties, and there can be no implied-in-law contract when there is an express contract between the parties relative to the same subject matter").

3.    Negligence

Phillips' negligence claim fails as a matter of law.  "Conduct that constitutes a breach of contract does not subject the actor to an action in tort for negligence, unless the conduct also constitutes a breach of an independent duty that did not arise from the contract."  Dakota Grain Co., Inc. v. Ehrmantrout, 502 N.W.2d 234, 236-37 (N.D. 1993).  Phillips alleges only that Dirtworks breached a duty to supply conforming aggregate for the Project—the precise basis for the breach of contract claim.  Attempting to keep it afloat, Phillips argues the negligence claim is proper in the alternative event that no contract exists between the parties.  But if no contract exists, then Dirtworks never owed a duty to provide Phillips with aggregate at all.  Thus, Dirtworks did not owe an independent duty to supply conforming aggregate that could support a viable action for negligence.

4.    Breach of Warranty

The Court is presently unable to resolve the breach of warranty claim.  Phillips does not specify whether it seeks recovery for breach of the implied warranty of merchantability or the implied warranty of fitness for a particular purpose.  See N.D. Cent. Code §§ 41-02-31, 41-02-32. In any event, these warranties—codified in North Dakota's variation of the Uniform Commercial Code ("UCC")—apply exclusively to contracts for the sale of goods.  Air Heaters, Inc. v. Johnson Elec., Inc., 258 N.W.2d 649, 653 (N.D. 1977).  The parties appear to characterize their contractual relationship as one for the provision of aggregate crushing services, not the sale of goods.  Because neither party has raised the issue, the Court is currently precluded from entering summary

judgment.  See Fed. R. Civ. P. 56(f).  Even so, the parties are now on notice that summary judgment may be warranted on this ground.  The Court will therefore permit supplemental briefing, on this issue only, as directed below.

If one or both of the UCC warranties is available, then similar to the breach of contract and unjust enrichment claims, fact disputes regarding the aggregate's conformity to NDDOT specifications prevent summary judgment.  Dirtworks will again be permitted to renew its motion because the September Agreement, if found enforceable, contains a disclaimer of implied warranties that may impact the ability to proceed with this claim.

**B.      Dirtworks' Frank Pit Counterclaims**

The Court now turns to Phillips' motion for partial summary judgment.  Relying on breach of contract and quantum meruit, Dirtworks' Frank Pit counterclaims assert damages for Phillips' refusal to pay in excess of $1 million for reject material billed at the end of the Project, as well as for unpaid invoices and for amounts withheld as retention from otherwise paid invoices.  As for the "loss of past and future profits" claim, Dirtworks concedes this cause of action is more appropriately labeled as a distinct breach of contract claim based on Phillips' alleged promise to provide Dirtworks with additional crushing work in western North Dakota as part of the February Agreement.

1.      Breach of Contract

Phillips raises a slew of objections to Dirtworks' breach of contract claim.  Specifically attacking the claim for reject material arising from the February Agreement, Phillips argues that (1) there is no written agreement to pay for reject, and a no oral modification clause in the September Agreement bars any alleged oral agreement; (2) the February Agreement is too indefinite to be enforceable; (3) no one from Phillips with requisite authority entered into the

February Agreement; and (4) Dirtworks waived or released any right to payment for reject. Phillips separately asserts that Dirtworks is precluded from seeking damages for already paid invoices with accompanying signed lien waiver and release forms. Fact disputes abound, rendering summary judgment unavailable.

Addressing Phillips' arguments in turn, its initial contention—that the nonexistence of a written agreement defeats the claim for reject material—falls flat. North Dakota law unequivocally establishes that written contracts may be modified by a subsequent executed oral agreement.[5] N.D. Cent. Code § 9-09-06; see also Sanders v. Gravel Prods., Inc., 2008 ND 161, ¶ 11, 755 N.W.2d 826. The July Agreement places no limitation on oral modification, so the fact that the parties did not reduce the February Agreement to writing is not an obstacle in the event that agreement controls. The September Agreement, however, contains a no oral modification clause, which North Dakota courts routinely enforce. See Benz Farm, LLP v. Cavendish Farms, Inc., 2011 ND 184, ¶¶ 14-16, 803 N.W.2d 818. In a footnote, Phillips purports to accept Dirtworks' version of events as true for purposes of its own summary judgment motion. Doc. No. 56, p. 1. The most tangible effect of this maneuver is the acceptance of the September Agreement's enforceability,[6] allowing Phillips to take advantage of the no oral modification clause. The obvious difficulty with this posture is that Phillips vigorously contests the validity of the September Agreement in opposing Dirtworks' summary judgment motion. The untenable result

---

[5] Dirtworks takes the position that the February Agreement supplements, rather than modifies, the parties' contractual obligations. Not so. Because Dirtworks alleges the parties agreed on payment for reject after both the July and September Agreements were executed, the February Agreement would constitute a contract modification. See Sokol & Assocs. Inc. v. Techsonic Indus., Inc., 495 F.3d 605, 610-11 (8th Cir. 2007).

[6] Despite ostensibly accepting Dirtworks' factual allegations as true, Phillips continues to rely on the July Agreement for multiple arguments throughout its supporting memorandum, which the September Agreement would supersede if deemed valid.

could be the Court granting Phillips' motion based on the September Agreement, only for Phillips to later assume the plainly inconsistent position that the same contract is unenforceable at trial. See Krenz v. XTO Energy, Inc., 2017 ND 19, ¶¶ 33-34, 890 N.W.2d 222 (explaining the doctrine of judicial estoppel). In the interests of equity and judicial economy, the Court declines to consider Phillips' arguments predicated on the September Agreement until its validity is resolved.

Phillips' remaining arguments against the reject material claim hinge on genuine disputes of material fact. Again, "[t]he existence of an oral contract and the extent of its terms are questions of fact." Lord & Stevens, Inc., 2008 ND 189, ¶ 12, 756 N.W.2d 789. The trier of fact must determine whether the parties reached an oral agreement to pay for reject, as well as the terms of that agreement, antecedent to the Court determining as a matter of law whether the February Agreement is reasonably definite in its terms. And the trier of fact likewise must resolve Hill, Stull, and Stephens' authority to bind Phillips to such an agreement because there are fact disputes as to their actual or ostensible authority to do so. The waiver and release argument is also unavailing. Phillips asserts that Dirtworks waived any claim for reject by billing in lump sums at the end of the Project because the July Agreement required the submission of monthly invoices. But Phillips allegedly permitted Dirtworks to bill for reject in lump sums at the conclusion of the Project as part of the February Agreement. If proven true, then that oral permission would operate as a partial modification of the July Agreement's provision requiring Dirtworks to submit monthly invoices. And if the September Agreement controls, then Dirtworks was not required to submit monthly invoices for the Project in the first place. Finally, the conditional waiver and release forms do not help Phillips here. Each form identifies individual invoices and exclusively releases Phillips from obligations for labor, services, equipment, or materials actually invoiced through a specified date. See Doc. No. 57-3. The forms' plain language cannot be construed so broadly as

to release Phillips from payment obligations for all work performed prior to the date on each form. The Court therefore denies summary judgment on the claim for reject material, but Phillips may renew its motion upon resolution of the September Agreement's enforceability or a determination of the February Agreement's existence and applicable terms.

For the remaining invoices, to the extent Phillips paid Dirtworks for invoices with attendant executed conditional lien waiver and release forms, Dirtworks may not claim additional damages. The parties agree that the claims for unpaid invoices, as well as for amounts withheld as retention on otherwise paid invoices, may proceed.  See Doc. No. 97, p. 12.

    2.     Quantum Meruit

As with Dirtworks' breach of contract claim, fact disputes prevent summary judgment on the quantum meruit claim.  "Quantum meruit is an equitable action in which the law implies a promise to pay for the reasonable value of services furnished."  Hayden v. Medcenter One, Inc., 2013 ND 46, ¶ 22, 828 N.W.2d 775.  "Ordinarily, the right to recover under a theory of quantum meruit is fact dependent."  Schmidt v. First Nat'l Bank & Tr. Co., 453 N.W.2d 602, 605 (N.D. 1990).

Phillips asserts that dismissal of the quantum meruit claim is required because of Dirtworks' reliance on an express contract.  Though true that an action for quantum meruit is impermissible when a contract affords recovery, the North Dakota Supreme Court has found that discarding an equitable claim prior to ascertaining the availability of a legal remedy for breach of contract is premature.  See Erickson v. Brown, 2008 ND 57, ¶¶ 39-42, 747 N.W.2d 34.  Similar to Phillips' unjust enrichment claim, then, Dirtworks' quantum meruit claim will be extinguished insofar as recovery is available on its breach of contract claim.  Summary judgment at this stage of the litigation is inappropriate.

3.      "Loss of Past and Future Profits"

Summary judgment is required, conversely, for Dirtworks' mislabeled breach of contract claim. Phillips' promise to provide additional crushing work as part of the February Agreement is nothing more than an unenforceable agreement to agree. "Generally, an 'agreement to agree' is unenforceable because its terms are so indefinite it fails to show a mutual intent to create an enforceable obligation." Lire, Inc. v. Bob's Pizza Inn Restaurants, Inc., 541 N.W.2d 432, 434 (N.D. 1995) (citing Clooten v. Clooten, 520 N.W.2d 843, 848-49 (N.D. 1994)). "An agreement to agree is enforceable if its terms are reasonably certain and definite. Indefiniteness as to any essential element of the agreement may prevent the creation of an enforceable contract." Holbach v. Holbach, 2010 ND 116, ¶ 11, 784 N.W.2d 472 (cleaned up).

Mitchell alleges that Stephens—in April 2016—referenced 25 gravel pits in western North Dakota needing an estimated 500,000 tons of Class 5 aggregate crushed. Mitchell recalls vague details about the names and general locations of a select few of those gravel pits, and the sum of money he expected to receive is his personal estimate. Even accepting Mitchell's contentions as true, the parties did not agree on specific locations that work would occur, when the work would take place, or any prices for the aggregate crushed. Stephens' statements also did not occur until April 2016, well after the alleged February Agreement. This evinces ongoing negotiations rather than reasonably certain terms amenable to enforcement. Although Mitchell claims he agreed to complete the additional work as part of the February Agreement, in reality he agreed only to negotiate future contracts for aggregate crushing after the Project concluded. Because this promise is too indefinite to enforce, Dirtworks' "loss of past and future profits" claim falters.

## IV.    FAIRVIEW PIT CLAIMS

Dirtworks brings a discrete trio of claims arising from Phillips' work in the Fairview Pit: breach of contract (Count I), negligence (Count IV), and indemnification (Count V).  See Doc. No. 51.  Phillips moves for summary judgment outright on all three but does not assert Fairview Pit claims of its own.  Dirtworks' claims collectively contend that Phillips failed to supervise equipment and allowed excavation to occur outside the bonded area.

### A.    Breach of Contract

A fact dispute regarding the terms of the oral sublease bars summary judgment.  While the parties acknowledge they had an oral contract for Phillips to pay Dirtworks $2.50 per ton of aggregate produced from the Fairview Pit, they disagree as to a key term.  Dirtworks asserts that as part of the sublease, Phillips consented to supervise equipment and ensure that excavation occurred within the bonded area.  Bolstering this, Mitchell states that he walked the Fairview Pit with Sticka and pointed out the western boundary before he departed for the Frank Pit.  Phillips pushes back by relying on Dirtworks' lease with RKT, which delegated to Dirtworks the responsibility for confirming excavation took place within the permitted and bonded areas.  But the terms of the lease between Dirtworks and RKT are immaterial here.  See Swenson v. Mahlum, 2019 ND 144, ¶ 32, 927 N.W.2d 850 (deeming terms of primary lease "unrelated" to claim for damages by sublessor against sublessee).  If Dirtworks and Phillips orally agreed Phillips would assume responsibility for excavating within the bonded area, then Phillips may be liable for breaching that obligation.  Although RKT held Dirtworks responsible under the original lease, nothing in that lease prevents Dirtworks from separately recovering against Phillips for breach of the oral sublease.  The same reasoning applies to Phillips' argument that Dirtworks cannot claim damages because it did not own the Fairview Pit.  Dirtworks incurred significant liability to RKT

as a result of Phillips' alleged failure to mine within the bonded area and further lost the ability to resume mining the Fairview Pit due to the reclamation and additional bonding requirements imposed by the State of Montana. So damages, though not articulated with mathematical precision, are apparent. Accordingly, the trier of fact must resolve Dirtworks' Fairview Pit breach of contract claim.

### B. Negligence

Akin to Phillips' Frank Pit claim, Dirtworks' Fairview Pit negligence claim cannot escape summary judgment. Any duty Phillips owed to excavate aggregate within the Fairview Pit's bonded area arose from a contractual obligation. Phillips did not owe an independent duty to supervise equipment or ensure excavation occurred within the bonded area. Rather, that duty—if it existed at all—came about from the oral sublease between the parties. Dirtworks' negligence claim therefore requires dismissal.

### C. Indemnification

The indemnification claim seeks reimbursement from Phillips for the damages Dirtworks paid to RKT for reclamation work. "A right of indemnity may arise by express agreement or by implication." Superior, Inc. v. Behlen Mfg. Co., 2007 ND 141, ¶ 12, 738 N.W.2d 19. "The application of indemnity must turn on the facts of each case." Id. at ¶ 11 (citation omitted). Dirtworks does not claim that an express indemnification agreement controls here, instead relying on an implied contract theory of indemnity. "Not every contract or contractual relationship will produce an implied indemnity." Id. at ¶ 13 (citation omitted). Establishing such a right requires evidence of "a course of conduct, a special relationship, or unique factors indicating an intention to provide indemnity." Id. (citation omitted). The North Dakota Supreme Court has explicitly recognized that "a right of implied indemnity may arise where one party's breach of contract

causes a second party to breach a separate contract with a third party." Id. at ¶ 17 (internal quotation marks and citations omitted). But because implied indemnification is an equitable doctrine, that right is limited where an adequate remedy at law is available. See id.

In this instance, Dirtworks' right of indemnity, if any, will be limited to the extent recovery is attained on its Fairview Pit breach of contract claim. If indemnity is available, Dirtworks will bear the burden of establishing the kind of special relationship contemplated for implied contractual indemnification. The Court cannot determine the existence of such a fact-intensive relationship as a matter of law without a more thoroughly developed record, precluding summary judgment on Dirtworks' final claim.

## V.   CONCLUSION

The Court has carefully reviewed the entire record, the parties' filings, and the relevant legal authority. Phillips' motion for partial summary judgment (Doc. No. 55) is **GRANTED IN PART** and **DENIED IN PART**. Counts II (unjust enrichment), IV (negligence), and VI ("loss of past and future profits") of Dirtworks' counterclaim are **DISMISSED WITH PREJUDICE**. Genuine disputes of material fact remain as to Counts I (breach of contract), III (quantum meruit), and V (indemnification). For the Frank Pit breach of contract claim, Dirtworks may not pursue damages to the extent valid waiver and release forms have been executed for paid invoices, but may proceed with claims for reject material, unpaid invoices, and amounts withheld as retention. Phillips may renew its motion on Dirtworks' claim for reject material following resolution of the September Agreement's enforceability or a determination of the February Agreement's existence and terms.

Dirtworks' motion for partial summary judgment (Doc. No. 60) is likewise **GRANTED IN PART** and **DENIED IN PART**. Count IV (negligence) of Phillips' complaint is **DISMISSED**

**WITH PREJUDICE**.  Genuine disputes of material fact remain as to Counts I (breach of contract), II (unjust enrichment), and V (breach of warranty).  Phillips shall have fourteen (14) days from the date of this order to submit supplemental briefing on the applicability of the UCC implied warranties only, and Dirtworks may reply within seven (7) days of Phillips' response. Dirtworks may renew its motion on Phillips' remaining claims following resolution of the September Agreement's enforceability.  Considering the comprehensive briefing submitted, Dirtworks' motion for hearing (Doc. No. 66) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 10th day of April, 2020.

*/s/ Peter D. Welte*_____
Peter D. Welte, Chief Judge
United States District Court